*D.C. v. Schatz*, No. 1242-12-14 Cncv (Toor, J., May 27, 2015).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| D.C.<br> Petitioner<br><br> v.<br><br> KEN SCHATZ<br> Respondent | Docket No. 1242-12-14 Cncv |

RULING ON RENEWED MOTION TO DISMISS AND
CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case involves the question of what procedures are required by due process when a juvenile in state custody is moved to a restrictive placement. Marshall Pahl, Esq. from the Office of the Defender General represents the minor, D.C. Katherine D. Lucier, Esq. from the Office of the Attorney General represents the Commissioner of the Department for Children and Families.

Background

Petitioner D.C. was a juvenile in the custody of the Department for Children and Families ("Department") until March 24, 2015, when he reached eighteen years of age. On October 18, 2014, for the second time in six months, the Department placed D.C. at the Woodside Juvenile Rehabilitation Center ("Woodside") in Essex—the most restrictive placement for juveniles in Vermont—based on its administrative authority under Department Policy 171. Within eight days of his placement, as required by Department Policy 172, D.C. had an internal due process review before a hearing officer, who determined that D.C. met the criteria for continued placement at Woodside. That decision was upheld in an external due process review before a different hearing officer.

D.C. filed a habeas petition on December 1, 2014, but was released from Woodside on December 5, 2014. This court denied the Department's original motion to dismiss the action as

moot after D.C.'s release.[1] Now before the court are: (1) the Department's renewed motion to dismiss the case as moot because D.C. is no longer a minor eligible for placement at Woodside; and (2) cross-motions for summary judgment, accompanied by stipulated facts and exhibits, on the issue of whether the procedures afforded to D.C. meet due process requirements.

## I. Renewed Motion to Dismiss

The Department moves to dismiss the case as moot because D.C. is no longer a juvenile eligible for placement at Woodside. D.C. argues that the case is not moot because (1) the Department is collaterally estopped from re-litigating mootness; and (2) D.C. could suffer negative collateral consequences as a result of his placements at Woodside.

The court agrees that the case is not moot for the second reason identified by D.C.[2] Juvenile records are available to courts when an individual is charged as an adult, such as for the purpose of deciding bail. *See* State v. Madison, 163 Vt. 390, 395 (1995) ("Confidentiality [of juvenile records] should not serve as a shield to consideration of the facts necessary to carry out the judicial function . . . ."). D.C.'s history of Woodside placements can have a negative effect in future court proceedings: it could affect how a judge views D.C.'s likelihood of success on probation as opposed to being placed in custody. Dismissal is for that reason inappropriate.

## II. Cross-Motions for Summary Judgment

### Undisputed Facts

In 2012, D.C. was adjudicated delinquent for commission of simple assault and placed on probation. D.C. came into the Department's custody on July 9, 2013, after violating his probation for the second time. The Department first moved D.C. to a group home for three weeks and then

---

[1] *See* D.C. v. Ken Schatz, No. 1242-12-14 Cncv (Toor, J., Feb. 18, 2015).

[2] The court declines to address D.C.'s collateral estoppel argument because it is inadequately briefed. First, D.C. has not explained how the five elements of collateral estoppel apply here. *See* Trepanier v. Getting Organized, Inc., 155 Vt. 259, 265 (1990). Second, the statement from In re Tariff Filing of Central Vermont Public Service Corp., 172 Vt. 14, 20 (2001), which D.C. cites for the definition of collateral estoppel, actually refers to claim preclusion, a related but separate doctrine. Finally, this court denied the original motion to dismiss without prejudice to renewal.

2

to another group home for a month. In August 2013, the Department sent D.C. to live with his uncle, which he did for a year. However, the uncle refused to let the placement continue because D.C. was not following rules and had run away three times. Near the end of his foster placement, D.C. became agitated and incoherent, apparently because of his drug abuse. On September 29, 2014, the Department placed D.C. at Woodside for the first time. During his stay at Woodside, D.C. suffered a mental health emergency, as a result of which the Department moved him to the Brattleboro Retreat on October 1, 2014. After a two week stay, the Department moved D.C. to a group home. On October 18, 2014, the Department again administratively placed D.C. at Woodside after the group home refused to let him stay there due to his threatening behavior.

Woodside is a locked facility operated by the Department's Family Services Division. It is also the most restrictive placement for minors in Vermont. The Department admitted D.C. to Woodside based on Policy 171 in its Family Services Policy Manual. Under this policy, the Department can admit a delinquent minor in its custody to Woodside if (1) there is evidence that the minor "poses a significant risk to [himself] or to the community" and "demonstrates behavior that cannot be treated in an available setting less secure than Woodside"; or (2) "[t]here is reason to believe the youth is in need of immediate treatment" because he has a mental health condition, exhibits "self or other-harming behavior(s) requiring significant treatment intervention," and will suffer a "serious deterioration" without an intervention. Policy 171 at 2 (Joint Ex. 1). If a social worker thinks that a minor should be placed at Woodside, the social worker first has to discuss the appropriateness of such a placement with a supervisor before contacting the Department's client placement specialist. The specialist decides if a minor should be admitted to Woodside.

Placement at Woodside in these circumstances[3] is a "temporary measure" and minors can only stay there "until the risk can be managed in an available, less secure setting." Policy 172 at

---

[3] Placement can also occur on a long term basis or by court order, but neither situation is applicable here.

5 (Joint Ex. 2). In the interim, the social worker "aggressively pursues alternative placement" and discusses with the Woodside Director whether the minor's placement is expected to exceed eight days. Id. If a Woodside placement is expected to exceed eight days, the Department must notify the minor, the minor's attorney, the social worker, the client placement specialist, and the 8-day hearing officer that the minor is entitled to an internal due process hearing to determine whether he meets the Department criteria for continued placement. Unless the minor and his attorney waive it, the Department must hold the hearing before the end of the eighth day. The Department must discharge the minor from Woodside if it fails to hold a timely hearing. Id. at 2.

At least 24 hours before the hearing, the social worker must deliver to Woodside the minor's case file and three packets containing an affidavit alleging delinquent behavior; a court order (if any) authorizing placement at Woodside; a completed Woodside Screening Instrument (FS-678) or Detention Screening Tool; and any supporting papers. The hearing officer, the client placement specialist, and the juvenile defender each receive a packet. Id. at 2–3.

At the review, the hearing officer solicits factual evidence about the reasons for continued placement; whether the minor meets the relevant criteria; and what the preliminary plan is for the placement. The hearing officer also solicits the views of the minor and his attorney. Additionally, the minor and his attorney can invite others who have relevant information to participate. Id.

A minor can remain at Woodside beyond the eighth day if (1) he is a delinquent in the Department's custody; (2) he scores ten or more points on the Woodside Screening Instrument (FS-678); and (3) the "continued risk cannot be managed in an available less secure setting." Id. at 1–3. The Department bears the burden of proving that the minor meets all three criteria. The hearing officer's decision must set a discharge date, although the officer can opt to hold a second review if "the youth's conduct necessitates a review of the discharge plan" or if "the identified placement alternative becomes unavailable." Id. at 3. However, no minor can stay at Woodside

4

more than sixty days from the date of an administrative admission without the Commissioner's approval.

At D.C.'s internal review on October 24, 2014, hearing officer Corey Wood[4] determined that D.C. met the criteria for continued placement. First, D.C. had been adjudicated delinquent and was in the Department's custody. Second, D.C. scored more than ten points on the Woodside screening instrument: five points for his simple assault charge; three points for the three runs from his foster home; and three points for his prior placement at Woodside. Finally, the hearing officer concluded that the risk posed by D.C.'s behavior could not be managed in a less secure setting because none was available. 8-Day Hearing Decision (Oct. 24, 2014) (Joint Ex. 5).

If a minor will remain at Woodside after the internal review, the Department must notify him that he can "request a review before an external hearing officer who is not an employee of the department." Policy 172 at 4 (Joint Ex. 2). The external due process hearing must be held within ten business days of the minor's request, unless the minor waives that time frame. The hearing is audio taped and conducted as follows:

> All documentation that is helpful in determining whether or not the youth meets criteria for continued placement, including oral testimony and written reports, may be presented by any party. The external hearing officer may rely on this information to the extent of its probative value, even if it would not be admitted as evidence at a juvenile court hearing on a delinquency petition. The burden is on the division to prove that there is substantial evidence that the youth continues to meet criteria for continued placement outlined in Section A [of Policy 172]. The social worker, supervisor and/or Assistant Attorney General will represent [the Department]. The Juvenile Defender or other legal representative will represent the youth.

Id. The hearing officer must inform the participants of his or her decision within seventy-two hours and also issue a written decision within five business days of the hearing. Thirty days after the external due process hearing, the minor can request another such hearing.

---

[4] Corey Wood is a local attorney with whom the Department has contracted to preside over 8-day internal hearings.

D.C. had an external hearing on November 4, 2014. In a written decision, hearing officer David Greenberg[5] determined that D.C. met all three criteria for continued placement under Policy 172. External Hearing Decision at 5 (Nov. 10, 2014) (Joint Ex. 6). With respect to the third criterion, the hearing officer noted based on the testimony of the Department's social worker and psychologist that the risk posed by D.C.'s behavior could apparently be managed in a less secure setting, but that none was available. The hearing officer also noted that while the Department had tried to place D.C. into a drug treatment facility, the facility would not accept D.C. due to concerns about his past behavior. The Department discharged D.C. from Woodside on December 5, 2014 to a group home.

## Analysis

The Fourteenth Amendment to the United States Constitution provides that no State "shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV. D.C. moves for summary judgment on the ground that his administrative placement at Woodside violated his due process rights. D.C. argues that his placement is equivalent to revocation of probation or parole, and that he was therefore entitled to the same procedures that are mandated in those contexts by the U.S. Supreme Court's rulings in Morrissey v. Brewer, 408 U.S. 471 (1972) and Gagnon v. Scarpelli, 411 U.S. 778 (1973). The Department does not contest that some due process is required, but argues that to the extent that Morrissey applies here, the procedures currently used go beyond what that decision requires.

In Morrissey v. Brewer, the U.S. Supreme Court considered "whether the Due Process Clause of the Fourteenth Amendment requires that a State afford an individual some opportunity to be heard prior to revoking his parole." 408 U.S. at 472. The Court held that the Due Process Clause applies to parole revocation because "the liberty of the parolee . . . includes many of the

---

[5] David Greenberg is also a local attorney with whom the Department has contracted to preside over the external due process hearings for youth placed at Woodside.

6

core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." Id. at 482. The Court concluded that the parolee was entitled to "some informal procedural guarantees." Id. at 483. This includes: (1) a preliminary hearing to decide if there is probable cause to believe that the parolee has violated parole; and (2) a final hearing to decide the facts and whether those facts justify revoking parole. Id. at 485–88.

The Supreme Court extended Morrissey to the probation context in Gagnon v. Scarpelli, seeing no difference between revocation of probation and parole since both "result in a loss of liberty." 411 U.S. at 782. At the preliminary and final revocation hearings in either context, the "probationer or parolee is entitled to notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." Id. at 786.

D.C. argues that he was entitled to such an adversarial hearing before the Department placed him at Woodside. He asserts that the procedures that were actually afforded to him—both in their timing and content—fall short of the requirements set forth in Morrissey and Gagnon. Since this is an argument about procedural due process, the court must determine (1) whether D.C.'s placement at Woodside "implicates a liberty interest that is protected by the Due Process Clause," and (2) whether the Department's policies "afford sufficient protection to [that] liberty interest." Vitek v. Jones, 445 U.S. 480, 487, 494 (1980).

### 1. Liberty Interest

The U.S. Supreme Court has recognized that individuals have an interest in freedom from restraint on physical liberty. *See* Foucha v. Louisiana, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 23 (1979) ("It is self-evident that all individuals possess a liberty interest in being

free from physical restraint.") (Marshall, J., dissenting). "'Freedom from bodily restraint' means more than freedom from handcuffs, straitjackets, or detention cells. A person's core liberty interest is also implicated when she is confined in a prison, a mental hospital, or some other form of custodial institution, even if the conditions of confinement are liberal." Reno v. Flores, 507 U.S. 292, 315 (1993) (O'Connor, J., concurring).

Juveniles are in this respect no different than adults. The Supreme Court has made clear that juveniles have a "substantial" "interest in freedom from institutional restraints." Schall v. Martin, 467 U.S. 253, 265 (1984); *see also* Flores, 507 U.S. at 316 (O'Connor, J., concurring) ("[A] child's constitutional '[f]reedom from bodily restraint' is no narrower than an adult's."); In re Gault, 387 U.S. 1, 13 (1967) ("[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone."). D.C.'s placement at Woodside, a secure locked facility, clearly implicates this protected liberty interest. Although not expressly conceding this, the Department appears to have acknowledged it by creating due process protections in response to Judge Cheever's ruling in E.B. v. Young, No. S-11-85 WnM (Vt. Super. Ct. Dec. 23, 1986).[6] *See* Respondent's Mot. for Summ. J. at 6–8.

## 2. Due Process

Having determined that D.C.'s placement at Woodside implicates his liberty interest, the court must next consider whether the procedures afforded to him meet due process requirements. Vitek, 445 U.S. at 494. In Mathews v. Eldridge, 424 U.S. 319 (1976), the U.S. Supreme Court articulated a three-part due process test that looks at the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the

---

[6] The court notes the irony contained in the present situation. Ken Schatz, the Commissioner of the Department for Children and Families, was the attorney who represented the juveniles in E.B. in challenging the procedures for administrative placement at Woodside.

fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 335.

As to the first factor, the private interest that is at stake here is D.C.'s interest in freedom from institutional restraint. The loss of this freedom is a direct consequence of being placed at Woodside. As the Supreme Court aptly observed in Gault:

> The boy is committed to an institution where he may be restrained of liberty . . . . It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes a 'building with whitewashed walls, regimented routine and institutional hours . . . .' Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, [and] state employees . . . .

387 U.S. at 27.

Meanwhile, the government has a "legitimate and compelling interest in the safety of the child." In re A.D., 143 Vt. 432, 435 (1983). "Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as parens patriae." Schall, 467 U.S. at 265. "In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's parens patriae interest in preserving and promoting the welfare of the child." Id. (internal citation and quotation marks omitted).

With these interests in the balance, the court must next consider the "risk of an erroneous deprivation" of the juvenile's liberty through the procedures used. Mathews, 424 U.S. at 335.

As D.C.'s custodian, the Department for Children and Families has authority to place D.C. at Woodside. 33 V.S.A. § 5291(a) ("[T]he Commissioner shall have sole authority to place the child who is in the custody of the Department in a secure facility for the detention or

9

treatment of minors."). Such placement at Woodside is done on an emergency basis: a juvenile is placed there if he exhibits "self or other harming behavior(s)" and "there is reason to believe the youth will experience deterioration of their mental health condition" absent a secure treatment intervention. Policy 171 at 1 (Joint Ex. 1). Before a juvenile is placed at Woodside by the Department, three persons have to agree that such a placement is proper: the juvenile's social worker, his or her supervisor, and the Department's client placement specialist. Once placed, a juvenile can stay at Woodside only "until the risk can be managed in an available, less secure setting." Policy 172 at 5 (Joint Ex. 2). In the meantime, the social worker must "make concrete efforts to develop an appropriate placement alternative as soon as possible." Id.

The fact that the initial placement decision is subject to internal checks lowers the chance that a juvenile will be placed at Woodside erroneously. If a juvenile is expected to remain at Woodside beyond eight days, he is entitled to an adversarial due process hearing to determine if he meets the Department's criteria for continued placement. If the hearing officer finds that the juvenile meets the criteria, the juvenile can request a secondary, external due process hearing that must be held within ten working days of such a request. Finally, the juvenile can ask for a third hearing thirty days after the second one. Id. at 3–5.

Thus, a juvenile who has been placed at Woodside is potentially entitled to three levels of review. At the internal hearing, the juvenile is entitled to have an attorney; to receive a copy of the Department's evidence; and to present his own evidence and invite "other persons who have pertinent information to participate." Id. at 2. The juvenile has these same rights at the external hearing. Additionally, the scope of evidence that can be presented at the external hearing is broader than what can be presented in court. Id. at 4 ("All information that is helpful . . . including oral testimony and written reports, may be presented by any party. The external hearing officer may rely on this information to the extent of its probative value, even if it would

10

not be admitted as evidence at a juvenile court hearing on a delinquency petition."). This is in line with the pronouncement in Morrissey that due process "should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." 408 U.S. at 489. Finally, the presiding hearing officers, who are not Department employees, must state their findings in writing. These multiple steps of review further reduce the risk of an erroneous deprivation of a juvenile's liberty.

The last Mathews factor also requires the court to consider the probable value, if any, of additional or substitute procedures. 424 U.S. at 335. D.C. objects to both the content and timing of the current procedures, and argues that the procedural framework outlined in Morrissey applies here. However, D.C.'s argument rests on a faulty premise because the procedures set forth in Morrissey are already available to juveniles placed at Woodside. Content-wise, the procedures currently used by the Department are substantially the same as—or more protective than—the "minimum requirements of due process" in Morrissey. 408 U.S. at 489. For example, Morrissey did not even mandate that a parolee be represented by counsel at a revocation hearing. Id.

D.C. also seems to suggest that a court hearing is necessary instead of an administrative hearing, as would happen on a probation violation charge. However, he offers no authority to support that argument. The situation here is not a probation violation, but a placement decision by the Department. The Department "can change the placement of a child in its custody without resort to the juvenile court." In re J.S., 153 Vt. 365, 374–75 (1989); *see also* In re E.L., 171 Vt. 612, 613 (2000) (mem.). While this is admittedly placement in a restrictive environment similar to incarceration, it is not punishment but placement that is being decided here. The court is aware of nothing limiting the Department's discretionary placement authority only to less restrictive settings. "In establishing juvenile procedures, the Legislature sought to achieve a balance

between the authority of the juvenile court and the authority of the legal custodian. This balance dictated our conclusion in [an earlier case] that [the Department], as legal custodian of a child, has the authority to determine where that child shall live." In re B.F., 157 Vt. 67, 70 (1991).

Aside from the content of the current procedures, the only remaining issue is their timing. D.C. argues that he should have had an adversarial hearing prior to his placement at Woodside instead of one week later. The question is whether D.C. was denied due process because the Department provided him with only a post-deprivation hearing as opposed to a pre-deprivation hearing.

"A fundamental requirement of due process is the opportunity to be heard. . . . It is an opportunity which must be granted at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 (1965) (internal citation and quotation marks omitted). "Due process, however, does not always require prior process." Jordan by Jordan v. Jackson, 15 F.3d 333, 343 (4th Cir. 1994); *see also* Parratt v. Taylor, 451 U.S. 527, 540 (1981) ("[W]e [the Supreme Court] have rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation . . . ."), *overruled on other grounds by* Daniels v. Williams, 474 U.S. 327, 330–31 (1986). "[I]t is well-settled that the requirements of due process may be delayed where emergency action is necessary to avert imminent harm to a child, . . . provided that adequate post-deprivation process to ratify the emergency action is promptly accorded." Jordan, 15 F.3d at 343; *see also* Duchesne v. Sugarman, 566 F.2d 817, 826 (2d Cir. 1977) (even where the State permissibly removes children to state custody without due process, such as in an emergency, "the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed").

Here, the Woodside admission procedures balance the juvenile's liberty interest against the Department's interest in quickly placing a child in need of a treatment intervention. While

D.C. did not receive a pre-deprivation hearing, he received two post-deprivation hearings during the two weeks immediately following his admission to Woodside. D.C. has adduced no evidence which would lead this court to conclude that a pre-deprivation adversarial hearing would have been practicable or that the two post-deprivation hearings were not sufficiently prompt, such that he was deprived of due process. As the Supreme Court has stated:

> [D]ue process is flexible and calls for such procedural protections as the particular situation demands. . . . Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.

Morrissey, 408 U.S. at 481.

The procedures used cannot be so rigid that they prevent the Department from making a quick placement decision in an emergency. Where, as here, there are multiple levels of review to determine if a juvenile meets the criteria for placement at Woodside, the court is not persuaded that additional or substitute procedures are necessary. The court concludes that the procedures currently used by the Department sufficiently protect D.C.'s liberty interest.

### Order

The Department's motion to dismiss is denied. D.C.'s motion for summary judgment is denied. The Department's motion for summary judgment is granted.

Dated at Burlington, Vermont, this ___ day of May, 2015.

_____
Helen M. Toor
Superior Court Judge

13